**BOWLES, Administrator, Office of Price Administration, v. SISK et al.**

Civ. No. 2215.

District Court, D. Maryland.

June 6, 1944.

Daniel B. Leonard and Francis Key Murray, both of Baltimore, Md., and Lowell J. Grady, of Washington, D. C., for administrator.

Frederick W. C. Webb, of Salisbury, Md., and Hilary W. Gans, of Baltimore, Md., for defendants.

WILLIAM C. COLEMAN, District Judge.

This suit is brought by the Administrator, Office of Price Administration, under the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 925(c), in which an injunction is sought against the defendants restraining them from taking part in sales, as they are alleged to have been doing, of canned food products in which the sellers are processors of such products and where the amount paid by the buyers to the sellers and to the defendants exceeds what the Administrator asserts is the sellers' allowable maximum price for such products, plus allowable transportation charges actually paid by the

sellers or the defendants. The alleged unlawful practices of the defendants occurred subsequent to August 12, 1943, the date of issuance of amendment 14 to Maximum Price Regulation No. 306 contained in Section 1341.562b of this Regulation upon which the Administrator relies, and which is hereinafter quoted.

The material facts are found to be as follows: A. W. Sisk & Sons, hereinafter called Sisk, is a partnership organized in 1891, dealing in canned goods, with its principal places of business in Preston and Aberdeen, Maryland, and Boston, Massachusetts. At the time of and for a number of years prior to the enactment of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 901 et seq., about 95% of Sisk's annual gross business was that of a distributor of canned goods which were packed in the States of Maryland, Delaware, New Jersey and Virginia. The method followed by Sisk as such distributor was to purchase and take title to canned goods which would then be stored in Sisk's own warehouses in various places in Maryland, where they would be held until resold by Sisk to wholesale grocers throughout the United States, at market prices. About one-third of the canned goods thus resold by Sisk bore Sisk's own labels as distributors; approximately one-third bore labels of the processors from whom the canned goods had been bought and approximately the remaining one-third bore labels of the wholesale grocers to whom the foods were resold. In the year 1942, the approximate volume of this distributor business of Sisk was seven to eight million cases of canned foods, of a value of from $14,000,000 to $16,000,000.

In addition to Sisk's distributor business just explained, which was conducted for its own account and at its own risk, Sisk also acted during the same period as a broker for certain canners, selling the latter's canned foods for their account and being paid a commission by such canners for so doing. These brokerage transactions, however, represented only approximately 5% of Sisk's gross sales.

Besides its distributor and broker business, Sisk acts, and has for many years, acted as a factor, that is, has been engaged in the business of advancing money to canners or processors and supplying them with cans, labels and cases, as security for which a lien is taken by Sisk on the goods manufactured by the processor under an agreement requiring that such goods be billed and sold through the offices of Sisk, so that Sisk may control the repayment to itself of its advances to the canner or processor. For these services as factor, Sisk has received 1% of the gross sales price of the canned goods and interest at the rate of 6% per annum upon funds advanced.

Effective May 11, 1942, the Administrator issued a General Maximum Price Regulation covering the sale of all commodities, pursuant to authority contained in the Emergency Price Control Act of 1942 and Executive Order No. 9250, 50 U.S.C.A. Appendix, § 901 note, the effect of which was to limit the maximum resale price of goods resold by it, to the highest price charged by Sisk for such goods during the month of March, 1942, which it is conceded by Sisk afforded it a normal profit.

Effective January 26, 1943, the Administrator issued Maximum Price Regulation No. 306 covering canned and preserved foods which did not, however, by its terms, materially affect the operations of Sisk. Then, on August 2, 1943, the Administrator issued, effective August 5, 1943, amendment No. 12 to this Regulation No. 306 which regulated the maximum price for primary distributors, and distributors other than primary distributors, wholesalers and retailers, as follows:

"(a) Primary Distributors. A 'primary distributor' is a distributor, other than a wholesaler or a retailer, who purchases all he sells of the kind and brand of packed food product being priced and who customarily received shipment from the packer of at least 50% of his purchases in carload lots delivered to a warehouse or other receiving station not owned or controlled by any of his customers, for resale by him in less than carload lots." (Sec. 1341.-562).

"(b) Distributors who are not primary distributors, wholesalers or retailers. The maximum price for an item f.o.b. shipping point, of a distributor who is not a primary distributor, wholesaler or retailer shall be the maximum price of his supplier, f.o.b. shipping point, plus incoming freight paid by him.

"A 'distributor' is one who purchases all he sells of the kind and brand being priced

and resells it without packing and processing any part of it."

Sisk did not qualify as a primary distributor under this Regulation because it sold more than 50% of its purchases in carload lots. Since Sisk's purchases from canners were at their ceiling prices and since under amendment No. 12 to Maximum Price Regulation No. 306, just quoted, Sisk's maximum resale prices were the same as the purchase price to it, plus any incoming freight paid by it, the effect of this amendment No. 12 was to prevent the continuance of Sisk's operations as a distributor except at a loss, represented by the cost of doing business. Therefore, upon issuance of amendment No. 12, Sisk sought from the Office of Price Administration a reclassification of its status so as to permit it to continue as distributors with a reasonable profit, but without success, except Sisk was informed by duly authorized representatives of the Office of Price Administration that it should attempt to obtain the further compensation to which it alleged it was entitled from its customers, namely, its purchasers or wholesale grocers. Accordingly, Sisk communicated with the latter, with the result that they entered into two forms of agreement with Sisk.

Under one form of agreement, Sisk became the customer's agent for the purchase of canned goods for which services Sisk receives as compensation 3% of the purchase price of such goods, payable monthly, it being further agreed that no purchases are to be made by Sisk at prices in excess of the current applicable ceiling price of the seller; that Sisk is to receive no compensation from the seller; and that the compensation paid by the customer to Sisk is not to be included in the resale ceiling prices.

Under the other form of agreement, Sisk also became the customer's agent for the purchase of canned goods and for the furnishing of daily reports relating to current supplies of such goods, price trends, production figures, etc. For these services, Sisk receives compensation at a fixed annual rate, payable in equal monthly installments.

As a result of the aforegoing, as of August 5, 1943, Sisk ceased its operations as a distributor of canned goods but continued its operations as factor and also its warehousing operations, as heretofore

explained. Likewise, Sisk continued to act as a broker for the same canners as heretofore and the small volume of sales made by it in this capacity continued about the same as previously. However, Sisk discontinued purchasing canned foods for its own account and thereafter made no purchases of such goods except for the account of such wholesale grocers as had appointed Sisk their purchasing agent pursuant to one or the other of the agreements just explained.

On August 12, 1943, the Administrator issued amendment No. 14 to Regulation No. 306, known as section 1341.562(b) of that Regulation and which reads as follows: "In accordance with existing trade custom, every broker taking part in a sale in which the seller is a processor shall be considered as the agent of the seller and not the agent of the buyer. In each case the amount paid by the buyer to the broker, plus the amount paid by the buyer to the seller, shall not exceed the seller's maximum price plus allowable transportation actually paid by the seller or by the broker." This is the provision which the Administrator alleges Sisk has violated and a continuation of which the Administrator seeks to prevent through the present proceeding.

At the same time that the aforegoing amendment No. 14 was issued, the Administrator promulgated a statement of the considerations involved in its issuance which contains the following:

"The accompanying amendment to Maximum Price Regulation No. 306 adds a new section, sec. 1341.562b, to that regulation, making clear the position of brokers. The section provides that a broker taking part in a sale in which the seller is a processor shall be considered the agent of the seller and not the agent of the buyer. The section in effect does no more than to require that brokers operate as they have historically operated.

\*    \*    \*    \*    \*    \*

"The ceiling prices fixed by Maximum Price Regulation 306 for processors include a factor to compensate the processors for the commissions normally paid by them to brokers for negotiating sales, and it was contemplated that brokers and processors would continue to operate in their customary manner. However, certain brokers, acting in conjunction with the processors, have attempted to violate the intent of the regulation by considering

the broker the agent of the buyer. The brokers in these cases have attempted to charge the purchaser their commissions over and above the processor's ceiling. Thus, the processor receives the full ceiling price, which includes a factor to compensate him for brokerage fees, but does not pay the broker his fee. The accompanying amendment remedies this situation by providing that the broker shall be considered the agent of the seller, and that the price the buyer pays to the broker plus the amount he pays to the seller shall not exceed the processor's ceiling plus actual transportation actually paid by the seller or broker."

According to the uncontradicted evidence in the present case, Sisk has never acted as a broker for processors in connection with sales to any wholesalers who subsequently appointed Sisk their buying agent. Nor has Sisk received any commission or brokerage fee from any processors in such cases, nor collaborated with any processors for the purpose of requiring the wholesale purchasers to pay brokerage fees, in connection with any sales in which Sisk in fact acted as broker for the processor.

Directories of canned food brokers were introduced in evidence, in none of which issued prior to or since August 12, 1943, has Sisk been listed as such, nor has it been a member of any broker's association, nor advertised itself as such to the trade.

The National Food Brokers Association which embraces some eleven hundred members, defines a "food broker" as "an independent sales agent who performs the services of negotiating the sale of food and/or grocery products for and on account of the seller as principal, and who is not employed or established by, nor an affiliate, owner, subsidiary of, any trade buyer, and whose compensation is a commission or brokerage paid by the seller." (Article III, Section 1—National Food Brokers Association Constitution; N.F.B.A. 1944 Year Book and Directory, page 7).

The evidence is uncontradicted in the present case that since August 12, 1943, Sisk, whenever making purchases for the account of wholesale grocers pursuant to one or the other form of agreement heretofore explained, has acted as agent for such grocers and never as agent for the processors of the canned foods involved in such purchases. Also, there is no evidence in the present case that the payment of the agreed compensation to Sisk by its customers, the wholesale grocers, has resulted in an increase in price of the canned foods purchased, either to the retail customers of such wholesale grocers or to the consumer purchaser from such retail customers; nor has it increased the maximum price of the wholesaler or retailer as fixed by Regulations of the Office of Price Administration. Nevertheless, counsel for the Administrator in the present case assert that the present practices of Sisk violate both the spirit and letter of amendment No. 14, and that there can be no complete assurance that ceiling prices on canned goods, fixed by the Office of Price Administration, will not be violated unless Sisk's present practices are outlawed. Unfortunately, Maximum Price Regulation 306 as amended up to the present time, contains no definition of the meaning of the term "broker" as used in amendment No. 14. This Court has been told that the present proceeding is the first one to be brought involving an interpretation of this amendment. However, revised Maximum Price Regulation 271, effective during the period involved in the present controversy, relating to potatoes and onions, contains the following definition of "broker" which, by analogy at least, supports Sisk's position in the present case: "'Broker' means a person who is an agent for the seller of potatoes and onions at the terminal market or any other wholesale receiving point, and who does not customarily warehouse, storage or otherwise distribute potatoes and onions. If any person acts as agent for the purchaser his commission shall be paid by the purchaser and shall not be added to the purchaser's base price or maximum price." Sec. 8(11), 8 F.R. No. 104, page 7018.

There is no evidence whatsoever in the present case of any lack of good faith on the part of Sisk or wilful attempt to evade the rulings of the Office of Price Administration. On the contrary, the hearing has disclosed a long, earnest effort on the part of Sisk to have the Office of Price Administration promulgate an appropriate Regulation under which it might do business with its customers at a fair profit. Sisk found it could not so operate under the current definition of a "distributor"

788

and the maximum price allowed a "distributor" since it is merely the maximum price of his supplier, f.o.b. shipping point, plus incoming freight paid by the distributor. Sisk could not qualify as a "primary distributor" because it sold more than 50% of its purchases in carload lots. There appears to be nothing of a collusive, fraudulent or forbidden character in Sisk entering into the agreements as it has done, with its customers for the stipulated compensation. Indeed, it is only by a tenuous argument, contrary to what we believe to be a reasonable interpretation of amendment No. 14 and the statement of considerations involved in the issuance of that amendment, that the Administrator's position can be supported.

■■ As already explained, there is no evidence in the present case that as a result of what Sisk has done, any ceiling price has been violated. To promulgate fair and reasonable ceiling prices and to see that they are not violated is the primary function of the Office of Price Administration. It is not a legitimate function of that Office to annul or interfere with lawful practices on the part of any individual, firm or corporation, merely on the ground that the Office is afraid that otherwise it may not have complete supervision and control over all business practices. By this proceeding, the Administrator would have this Court make one a "broker" who is not a "broker" merely because certain persons or firms who are "brokers", acting in conjunction with processors, may have attempted to violate the intent of the price regulations by considering themselves the agent of the buyer, and thereby may have attempted to charge the purchaser their commissions over and above the processors' ceiling prices.

■ As the statement of considerations recites, the amendment "in effect does no more than to require that brokers operate as they have historically operated." Since Sisk has never acted as a broker for any processors in connection with sales to any wholesalers who subsequently appointed Sisk their buying agent, or received any commission or brokerage fee from any processor in such cases, we are satisfied that amendment No. 14 has no application to the present case. If the Office of Price Administration intended to cover the form of contractual relationship existing between Sisk and its wholesale grocer customers, it has failed to do so by any reasonable construction that we feel can be placed upon the amendment. Sisk should not be penalized for this failure. If processors or buyers have, as a result of their contractual relations with respect to canned foods, been involved in ceiling price violations, that is another question, to be dealt with separately by the Office of Price Administration. In short, the present proceeding is one of those so-called "test" cases, all too frequently brought by Government agencies without, apparently, an adequate effort having first been made to interpret their regulations to the trade involved, and to invite from that trade the sort of cooperation and good-will, without which no Government agency is able to function properly.

As a result of our conclusion that amendment No. 14 to Regulation No. 306 is not applicable to defendants' business as conducted during the period in question, it becomes unnecessary to consider the validity of this amendment, or whether a consideration of its validity by this Court would be precluded because of what was decided in Yakus v. United States (Rottenberg et al. v. United States), 321 U.S. 414, 64 S.Ct. 660; and Bowles v. Willingham et al., 321 U.S. 503, 64 S.Ct. 641.

For the foregoing reasons, the Administrator's petition must be dismissed.